FILED 2023 SEP 1 PM 1:06 USDC - FLMD - FTM

LEONARD G. HOROWITZ, pro se
7463 Pomegranate Drive
Bokeelia, FL 33922
Tel: 310-877-3002;
Email: len15@mac.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| LEONARD G. HOROWITZ, an individual. <br>     Plaintiff <br><br> vs. <br><br> EMERALD NUTRACEUTICALS, LLC, a corporation; MICHAEL GARCIA, an individual; JOEL "JOSEPH" ZUPNICK, an individual; CHESKAL ZUPNICK, an individual; STEVENS ADONIS, an individual; SPECIALTY RX, INC., a corporation; and DOES 1 through 50, inclusive <br><br>     Defendants | CIV. NO. 2:23-cv-696-SPC-NPM <br> (FDUTPA; Breach of Contract; Fraud, Tortious Interference; Civil Conspiracy) <br><br> **COMPLAINT FOR UNFAIR AND DECEPTIVE TRADE BY CIVIL CONSPIRACY IN VIOLATION OF FDUTPA, INTER ALIA, (Stat. § 501.202; 15 USC 45); AFFIDAVIT OF LEONARD G. HOROWITZ; SUMMONS.** <br><br> JUDGE: Hon. _____ <br><br> TRIAL DATE: _____ |

## COMPLAINT FOR UNFAIR AND DECEPTIVE TRADE BY CIVIL CONSPIRACY IN VIOLATION OF FDUTPA, INTER ALIA, (Stat. § 501.202)

COMES NOW LEONARD G. HOROWITZ (hereafter, "HOROWITZ," or "Plaintiff") filing this Complaint against the named Defendants seeking equitable relief, restitution, and attorney's fees and costs for Defendants' alleged breaches of contracts for the manufacture, distribution, and marketing of the Plaintiff's nutritional supplements (i.e., "nutraceuticals," and "528 electroceuticals");

alleged violations of The Florida Deceptive and Unfair Trade Practices Act, FDUTPA and fraud, Stat. § 501.202; also authorized by 15 USC 45; and laws protecting Plaintiff's equal rights to conduct business free from tortious interference and loss of prospective business advantage by a civil conspiracy in restraint of trade.

1

## I. PRELIMINARY STATEMENT

The Plaintiff and Defendants all commercialize in consumer health products. The Plaintiff exclusively commercializes natural remedies, whereas the Defendants commercialize natural health products as well as drugs and vaccines.

The Plaintiff claims the Defendants breached three contracts with the Plaintiff, and conspired to commit acts of unfair and deceptive trade; took money for promised services never provided; neglected remedial correspondence; refused to refund tens-of-thousands of dollars paid by Plaintiff without benefit unjustly enriching the Defendants; manufactured and distributed unauthorized products that caused the Plaintiff to lose loyal customers; damaged the Plaintiff's prospective business advantage causing millions of dollars in losses; and are alleged to have conspired to damage the Plaintiff and his businesses in favor of Defendants' competing interests in health products manufactured and distributed by Defendants, including competing drugs and vaccines.

After making false representations to acquire the Plaintiff's nutritional products manufacturing and distributing businesses in August 2022, by December, 2022, it became clear to Plaintiff that Defendants' representations were false, and that Defendants were ill-prepared to serve their contracts. With damages mounting beyond $75,000.00, and after repeated correspondence with Defendants' principle officer, Michael Garcia ("Garcia"), the Plaintiff was informed that Garcia, Emerald Corp., and Garcia's partners and principle financiers, Joel "Joseph" Zupnick of SpecialtyRx, Inc., and Stevens Adonis, were unwilling to refund any money that the Plaintiff had paid per contracts breached. Garcia's deceptive and damaging instructions to Plaintiff where not only to pay Emerald what amounted to more than $60,000.00, but also finance some new entity named "7 Digital" that Garcia and his partners had purportedly formed, or were preparing to form, according to Garcia.

2

This "rip off," involving $21,000.00 paid by the Plaintiff to this mysterious new entity "7 Digital," caused the Plaintiff to investigate Zupnick's business history. Thereby, Plaintiff discovered the Defendants' "CEO," Zupnick, had a *criminal conviction in 2018 for mismanaging a nursing home resulting in at least one elder's death.*

Drugs and vaccines were presumably supplied by Zupnick's SpecialtyRx business to that mismanaged facility. Subsequently, on August 31, 2021, Zupnick presumably changed his name to use an alias "Joel Zupnick," to register Emerald—Garcia's operation on Long Island. But according to these Defendants' 2018 press release, Garcia and Adonis own Emerald Nutraceuticals, LLC.

Consequently, the Plaintiff is suing for: (1) breaches of three contracts; (2) unfair and deceptive trade; (3) tortious interference with prospective business advantage; (4) fraud; and (5) civil conspiracy to deprive Plaintiff of his money and competing business interests.

## II. JURISDICTION, VENUE AND DEMAND FOR JURY TRIAL

a.   This Court has jurisdiction over this matter under 28 U.S.C. § 1332 by reason of diversity citizenship of the parties; and the matter in controversy exceeds the sum or value of $75,000.

b.   Venue in this District is proper under 28 U.S.C. § 1391 et. seq.

c.   The Plaintiff declines a <u>Trial by Jury</u>.

## III. THE PARTIES AND PERSONA
### A. Plaintiff

1. Plaintiff **LEONARD G. HOROWITZ** is a resident of Lee County, Florida, residing at 7463 Pomegranate Drive, Bokeelia 33922. He is a widely known expert in natural medicine, multi-award-winning author and filmmaker, and

3

inventor of several commercially successful products and services sold online internationally. Pursuant to this lawsuit, Dr. Horowitz pioneered "water structuring" technology; brought to market and trademarked several successful water-based "electroceuticals" that the Defendants were trained and outfitted by the Plaintiff to manufacture; then contracted to manufacture, distribute, and direct market those products online. This association was projected to return many millions of dollars in profits to the Plaintiff within six months, according to Garcia's verbal inducements that boasted Garcia's online sales team capabilities.

2. The Plaintiff pioneered and commercialized a special frequency of sound, 528Hz used in therapeutic drug and supplement manufacturing—intellectual property of great interest to the Defendants and their commercial interests. Accordingly, the natural antibiotic and "vaccine substitute" called "OxySilver$^{TM}$ with 528," recommended for medically-compromised people for whom injected vaccines are risky and contraindicated, was of great interest to the Defendants, who reneged on their contract with the Plaintiff to manufacture OxySilver$^{TM}$ with 528, thus damaging his business and converting his intellectual property for the Defendants' commercial advantage in unfair and deceptive trade.

## B. Defendants
### a. EMERALD NUTRACEUTICALS, LLC.

Defendant EMERALD NUTRACEUTICALS, LLC. (hereafter, "Emerald"), with operations at 48 Mall Drive, Commack, NY 11725, was established by Michael Garcia and Stevens Adonis in 2018, with "Joel Zupnick" as CEO. This company is described as "a vertically integrated private label supplement manufacturer of private label supplements. . . . offer[ing] in-depth guidance and assistance with brand development to ensure you are set up for success." Garcia

advertised Emerald as having "generated over $15 million in sales," during its first years of operation, "and has expanded its distribution to 3,000 stores across the U.S. and abroad."

   **b. MICHAEL GARCIA** (hereafter, "Garcia"), is the chief administering officer of Emerald, and is also the CEO of "Stronger Snacks" according to Garcia's LinkedIn advertisement. Garcia informed the Plaintiff that his start-up money came from a "rich Jewish guy in New Jersey," presumably referencing Joel "Joseph" Zupnick (a.k.a. Zupnik), who needed to be consulted regularly on the advancing limited "partnership" between the Plaintiff and Defendants, according to Garcia.

   c. **JOEL "JOSEPH" ZUPNICK** (a.k.a Zupnik; hereafter, "Zupnick"), is the co-owner and President of Focus nursing home, intertwined with Cold Spring Hills Center for Nursing & Rehabilitation; and director of SpecialtyRx, Inc, a nursing home drug and vaccine supplier. Zupnick is presumably co-owner and investor with his brother, **CHESKEL ZUPNICK**, Emerald's CFO. In 2018, contemporaneous with launching Emerald, "Joseph" Zupnick plea-bargained on one of eight criminal counts resulting in at least one nursing home death. "JOEL ZUPNICK is associated with dozens of nursing homes in 6 states, including Florida, New Jersey and New York; and according to NursingHomeDatabase.com, he is associated with 8 nursing homes that "have been associated with possible abuse," resulting in a personal/professional rating of "2.28 out of 5 Stars involving 54 nursing homes," as published online July 1, 2023.

   d. **SPECIALTYRx, INC.** is a pharmaceutical supplier to nursing homes across the United States, with offices at 2 Bergen Turnpike, Ridgefield, NJ 07660-2340. According to the Better Business Bureau, This company started in 2018 with Mr. Joel Zupnick as Vice President.

   e. **STEVENS ADONIS** is Garcia's partner in Emerald Nutraceuticals, LLC.

5

**IV. STATUTES OF LIMITATIONS**

3. The four-year statute of limitations has not run on the alleged tortious interference with prospective business advantage and other claims brought herein.

4. Nor has the limitation period run on the tort claims violating the FDUTPA; Stat. § 501.202.

5. This Complaint is also timely pursuant to 42 USC § 1981 protecting Plaintiff's equal rights to conduct business free from tortious interference and loss of prospective business advantage; by a civil conspiracy in restraint of trade by deceptive means.

**V. FACTS**

6. In early August, 2022, the Plaintiff began contracting with Mr. Brian Gould ("Gould"), the owner of TruLife distributing and marketing company, Boca Raton, Florida, to generate millions of dollars in prospective sales of the Plaintiff's products (e.g., "OxySilver™ with 528"; and Liquid Dentist™") to national chain stores including Walmart.

7. The large volume of sales and prospective business advantage required large scale manufacturing services; with TruLife subsequently administering marketing and distribution of the Plaintiff's products.

8. To advance said contract and commerce, Gould referred the Plaintiff by e-mail and teleconference to "Michael Garcia CEO at Emerald Corp," in New York, with whom Gould had worked.

9. On August 4, 2022, Garcia contacted the Plaintiff by e-mail to initiate said manufacturing.

10. On August 15, 2022, Garcia and the Plaintiff discussed the terms of a "strategic alliance" with TruLife, and initiated a non-disclosure and non-circumvention agreement on-or-about August 23, 2022.

11. Around this time, Garcia disparaged the marketing capability of TruLife to persuade the Plaintiff to rely exclusively on Garcia and Emerald to successfully distribute, as well as market online, the Plaintiff's products. Then, on August 26, 2022, Garcia and the Plaintiff entered into an agreement that circumvented TruLife's participation in the proposed business "partnership."

12. On August 26, 2022, Garcia provided the Plaintiff with "pricing" for each of the Plaintiff's four best-selling products; and the next day, after the Plaintiff asked how long it would  take to manufacture the four products, Garcia replied "I can get the team geared up within 10-14 days to write SOPs, convert formulas to our UOM's etc."

13. In Garcia's August 27, 2022 e-mail, the Defendants detailed the Manufacturing Contract that Plaintiff accepted, stating "the minimum order of each formula (2500 bottles) total would be $67,325. . . . We are available as early as next weekend and the following Monday to set up install and train [personnel in the use of equipment to be supplied by the Plaintiff]."

14. On August 29, 2022, Garcia stipulated, "For that $67,325 I am not needing to produce the inventory up front and have it sit. I am willing to use that payment as a credit and you can produce inventory as needed. I could even accept 50% up front on the $68,325 and you can pay the balance as we produce inventory."

15. On August 29, 2022, Garcia requested a deposit of $35,000, and amended his contract stating, "I can produce orders as small as 500pc at a time for you."

16. On August 29, 2022, the Plaintiff also requested Garcia take over all "Distribution/Fulfillment" of the Plaintiff's products, and asked Garcia, "What are the fees for you shelving and distributing/fulfilling orders?"

17. On August 31, 2022, Garcia e-mailed the Plaintiff the contract prices for fulfilling orders; administering all distribution for the Plaintiff and his company.

18. Also, on August 31, Garcia and the Plaintiff discussed marketing services to be provided by Emerald that were offered by TruLife. For efficiency and economy, Garcia and Horowitz agreed to have Emerald administer Internet marketing services and Amazon sales, represented by Garcia to be well within Emerald's team capabilities.

19. On August 31, 2022, "Dr. Horowitz" was invoiced (by Emerald in invoice # SO-2045) for $67,825.00; and timely paid the agreed deposit of $35,000.00 (by wire).

20. Between September 1 thru the 15th, the parties worked together to draft new labels for the Plaintiff's products; and on September 17, 2022, Garcia agreed to schedule "October 10-12" for Horowitz's arrival at the company to install the needed manufacturing equipment and train personnel in its use.

21. On September 27, 2022, Plaintiff informed Garcia that his home and business operations were heavily damaged by Hurricane Ian, encouraging Emerald staff to expedite manufacturing and distribution services to save Horowitz's companies by fulfilling mounting backorders.

22. On October 10, 2022, Plaintiff delivered and set up at Horowitz's expense his manufacturing equipment in a lab at Emerald; and began training a staff person named "Justin Mistretta," rather than Garcia's pledged "family member".

23. From October 10 thru October 18, 2022, Plaintiff worked alone in Emerald's lab, in Mistretta's consistent absence, to produce, and exclusively pay for the 'initial production' of 60 gallons of "OxySilver with 528"—the base product also needed for all the other "electroceutical" products to be manufactured.

24. On or about October 12, 2022, Garcia and Plaintiff met to discuss and plan launching a new brand for Horowitz products that the Plaintiff named "528 Electroceuticals."

25. On October 23, 2022, Garcia e-mailed the Plaintiff, "I discussed the launch with my partner [presumably co-owner Zupnick and/or Adonis] and we decided it will make the most sense for us to launch this [528 Electroceuticals] brand under our Marketing company 7 Digital."

26. Garcia justified converting the Plaintiff's contract(s) with Emerald to this new company unknown to Horowitz. "This will allow us to launch the other products we have in the pipeline without having to work two separate Amazon accounts," Garcia wrote.

27. Garcia added in his October 23rd e-mail, "We are ready to hit the ground running and have started the process of creating the Amazon account and want to begin the marketing piece as soon as possible. I will send over the proposal for your attorneys review tomorrow." But Garcia neglected to send "the proposal," despite the Plaintiff's repeated requests and reminders.

28. Between October 28th and November 10th, Garcia assigned his subordinate "Product Manager," Michael Pfenning ("Pfenning"), to oversee all of the tasks

required to direct manufacture of the Plaintiff's products, and bill Horowitz accordingly.

29. Contemporaneously, Plaintiff was billed by Emerald, and paid in full by wire on-or-about Oct. 29th, another $21,000.00 for invoice # SO-9449; to pay, in advance, for an additional "6,000 pcs" of Horowitz's three top-selling products that were never produced.

30. On October 29, 2022, Garcia promptly rejected the Plaintiff's contracted wire payment to Emerald of $21,000 writing, "This wire was . . . sent to the wrong account. . . . The correct account to send is – Name: Michael Garcia . . . 2229 Dolphin Ln., Holbrook NY 11741." So the Plaintiff promptly wired the $21,000.00 purportedly financing 7Digital, but actually Garcia personally.

31. On and before November 10, 2022, following Garcia's repeated false representations that Emerald would efficiently and effectively administer the Plaintiff's online sales by relying on Garcia's IT technician, "Kenny," to direct orders into Emerald's fulfillment software, Horowitz pleaded for this service to no avail. "I will take care of this today," Garcia e-mailed Plaintiff on November 10, but he neglected to do so once again.

32. On November 16, 2022, Pfenning, in charge of accounting for Plaintiff's orders, sales, and inventory, erroneously informed the Plaintiff that his entire stock of Liquid Dentist had been depleted; causing Horowitz severe emotional distress, and prompting Horowitz to itemize sales when he discovered Pfenning's grossly mistaken accounting.

33. On November 16, 2022, Pfenning caused the Plaintiff to authorize by e-signature defective product labels in "Satin" finish rather than "Gloss," after Plaintiff had verbally instructed Pfenning to order the high gloss labels. Rather

than accepting Horowitz's instructions, Pfenning's argument and imposition caused the labels to be of such poor quality and readability that they needed to be reordered; causing further delays in manufacturing and order fulfillment.

34. Contemporaneously, Plaintiff was informed by Garcia's subordinates that manufacturing could not proceed because the pump(s) required for bottling was(were) defective, and needed to be repeatedly reordered. "Three times" the pump(s) required reordering to no avail, causing manufacturing and product order-fulfillment delays that resulted in many unhappy and lost customers, as well as many costly refunds paid by the Plaintiff.

35. During the two week period, November 14 thru 25, 2022, as manufacturing had been repeatedly delayed and excused by Garcia and his subordinates, Emerald staff printed USPS shipping labels untimely, causing customers to falsely believe the Plaintiff's products had been shipped when they were not.

36. On November 25, 2022, Garcia replied to the Plaintiff's pleading for more timely and competent administration of the Defendants' promised distribution services by admitting, for the first time, Emerald was not set up to administer Horowitz many orders timely and according to professional standards for order fulfillment. Garcia excused himself and Emerald by writing, "I don't have the staff back there to ship out [the products using the printed USPS labels]."

37. Subsequently on the 25th, Garcia wrote: "I am sorry that got sent before I finished typing. What I meant was, I do not have the staff back there to ship out more than 40-60 orders per day and all the shipping labels were printed out on the 18th." This was also false and misleading.

38. In reply, the Plaintiff wrote Garcia, "Even if only 40 orders were shipped per day, seven days would be 280 orders. That is approximately ALL of the

outstanding orders. I am attaching the list I did for Michael P showing this. I've had only one customer tell me they received their order so far."

39. To avoid further delays and mounting damage, the Plaintiff asked Garcia, "do you want me to help ship??? If so, I would need a good supply of all three products to be shipped to Florida ASAP. I need a case of each sent to me regardless in order to fill 'mixed orders'." Garcia responded, "I will get a full detail on this for you today." But he never did.

40. On November 28, 2022, neglecting repeatedly the Plaintiff's pleadings for timely competent administration of the Plaintiff's distribution contract with Garcia and Emerald, Horowitz protested and summarized the breach of contact thusly:

> "This is an example of what I am dealing with now repeatedly daily, and that we must address. The screenshot shows there has been no movement from emerald for 10 days. Customer service on delayed orders weighs heavy on my time/administration, reputation, professionalism, company integrity, and customer reviews online.
>
> There should be someone assigned in Emerald to: (1) follow thru timely on orders being shipped; and (2) handle missing order shipments such as this, as well as coordinate with me 'mixed orders'. At present, I don't know what to tell people because when I look at an order such as this, and it shows no movement from Emerald for the past 10 days (i.e. the stamp was printed on Nov. 18), then I can only dream up poor excuses to tell people, and offer them a refund. I don't even know who on the team I should talk to about this."

41. Curtly dismissing the Plaintiff's above correspondence and suggested remedies, Garcia simply diverted Plaintiff's dialogue to another subordinate by writing, "Please contact Support@theemeraldcorp.com for a status on what has shipped. Please CC me as well."

42. In addition, between mid-October and mid-November, 2022, and following the October 12 meeting with Garcia to launch the new "528 Electroceuticals" brand,

Garcia solicited the Plaintiff to produce three media presentations, representing that they would be needed and used for generating online sales of Horowitz's products and new electroceuticals brand. The doctor produced these three media presentations at the doctor's exclusive expense, but Garcia never kept his word, and the three media segments remained neglected.

43.  On-or-about December 6-7, 2022, Garcia's subordinate, Pfenning, e-mailed the Plaintiff Emerald's quote, "SO-9639," to produce 500 bottles of the new "528 Electroceuticals" multi-vitamin formula called "PureGo with 528" for $6,975.00. Garcia had represented that product and brand would be manufactured, marketed, and distributed in a special new bottle and label for the pledged new partnership with Horowitz, 7Digital and Zupnick. This turned out to be false.

44. On December 6, 2022, the Plaintiff e-mailed Garcia "and team" to address repeated neglected order fulfillment problems that included "mixed orders" and customer complaints. The Plaintiff wrote:

> "A final decision by [Garcia] Mike G is needed most timely regarding production of PureGo versus a 'knock-off' "528Electroceuticals" product as we discussed briefly at our meeting a month ago, and I have been awaiting a decision on this since. I have inquired several times to no avail."

45. On December 7, 2022, Pfenning e-mailed Horowitz wire payment instructions to Emerald's bank, not Garcia's personal bank account previously designated to receive wire payments for the new "partnership" in "528 Electroceuticals" involving Zupnick and the PureGo with 528 product manufacture contract.

46. On December 7, 2022, Pfenning e-mailed the Plaintiff a summary of accounting and payments made to Emerald that totaled $35,000, disregarding the fact that Horowitz had exclusively manufactured (using his machines), and exclusively at his personal cost (albeit alone in Emerald's lab) all the liquid

"OxySilver with 528" needed to produce all of the initial order, "SO-2045," plus a substantial amount of the 4,000 bottle order "SO-9449" that Emerald never produced.

47. During the first week of December, 2022, the Plaintiff began to receive many complaints from customers stating that the flavor of the "Liquid Dentist" produced by Emerald was unsavory, too sour. This resulted from the Defendants' delays and neglect to supply test samples of products for approval by the Plaintiff prior to bottling and shipping. This failure to supply test samples for approval breached professional and industry standards, as well as the parties' manufacturing contract. This problem resulted in the Plaintiff having to issue many refunds to complainants, and/or subsequently ship approved products produced elsewhere.

48. Also during the first week of December, 2022, the Plaintiff began to receive many more complaints from customers who feared their products had been tampered with, and even poisoned. This resulted from the Defendants' neglect to seal the bottles using standard leak-proof seals that had been repeatedly requested by the Plaintiff. In fact, this breach of professional and industry standards, and the parties' contract, was caused by Garcia's lacking responsible oversight of Mr. Pfenning, who repeatedly and arrogantly argued against the Plaintiff's instruction to seal the bottles with an "inner cap lining" seal that glues to the rim of the bottle, versus Pfenning's administration of "shrink-wrapping" the cap that fell far short of sealing the bottle. On December 9, 2022, Horowitz e-mailed Garcia and Pfenning, "I mentioned to Mike P that this would not work for my customers weeks ago. Now you have evidence that I gave you good advice to no avail."

49. On December 9, 2022, Pfenning billed "Dr. Horowitz" $1,191.50 for the delayed, haphazard, and incomplete distribution services Emerald provided, plus another $1575.00 for "SO-9643"—ordering 500 bottles of "4oz OxySilver for

Pets" that was never produced by Emerald—that actual product having been exclusively manufactured by the Plaintiff during the week of October 10-15. These two billings were both paid in full by Horowitz.

50. Contemporaneously, Garcia excused Emerald's failure to deliver timely, efficiently, and competently on their distribution contract stating that Emerald was 'under-staffed' and "moving" its fulfillment warehouse "across the street" wherein additional personnel would be available to serve the Plaintiff's contract.

51. On December 12, 2022, the Plaintiff, overwhelmed with problems caused by the Defendants actions and inactions, requested a "full refund from Emerald," stating, inter alia:

> Today, you avoided two scheduled teleconferences with me seeking: (1) customer service information; (2) a conference call with 'Kenny,' and (3) secure fulfillment on mounting orders once again delayed, you justify my sending you this notice requesting a complete refund of all the money I invested in you and Emerald to produce liquid nutritional products . . .

> Please recall that on August 27, 2022, you replied to my questions, including how long it would take to "gear up" to produce our four products, and you wrote "10-14 days." This prompted me to entrust you and Emerald's capacity to make good on our manufacturing and distribution agreements. The "10-14 days" for "gearing up" for manufacturing after payment was received has now become six weeks to three months or more.

> Today, because of your other business dealings, you were precluded from keeping two scheduled dialogues with me, prompting me to realize that you and Emerald can't be trusted to keep your commitments, and that I (and my account) don't (doesn't) matter sufficiently for you to keep your appointments or promises. . . .

> Please keep in mind that the products Emerald produced, but never taste-tested for quality assurance, never labeled professionally, and never sealed securely, not even shrink-wrapped properly, has damaged my reputation and company now reeling with customer complaints and demands for refunds. Please consider, therefore, my need to issue full refunds most timely to complainants as requested....

> Having stuck by you multiple times, given you the benefit of doubt, your busy schedule and company troubles, including staff shortages, have compounded my challenges and damages over the past two months. Emerald has demonstrated repeatedly that, contrary to your representations, Emerald was never set up to produce quality liquid products for my account, not even the high-quality product labels and bottles with safety seals standard in our industry."

52. On December 13, 2022, Garcia refused the Plaintiff's refund request writing, "Is this a serious request here?"

53. Repeatedly thereafter, to the time of this filing, Garcia denied providing any refund, even though the Defendants' never manufactured the thousands of bottles of products for which they were paid; imposing instead that Horowitz continue to rely on the Defendants pattern and practice of false and misleading assurances.

54. On December 13, 2022, the Plaintiff e-mailed Garcia/Emerald a "CEASE AND DESIST" notice staying the pre-paid manufacture of 2,000 bottles of Liquid Dentist, stating as justification:

> ". . . . I have never been provided any sample to taste test, so I cannot approve a 2000 bottle run without a test sample; nor have I heard from Tal as I requested; nor has anyone ever informed me about the status of that order, so we must presume no manufacturing has occurred to date. But, even if this order for Liquid Dentist was produced, the previous production was so terrible tasting, that customers are requesting refunds now. I do not want to pay for such a product. So please stop, cease and desist from further action on that order. And please speak with Mitch [Plaintiff's counsel] about resolving these matters."

55. During Garcia's subsequent correspondence with Plaintiff's counsel, Garcia cited Emerald's expenditures for bottles, labels, and ingredients purchased on behalf of the Plaintiff's contract that, contrary to reasonable settlement proposals and refund/debt deductions offered by creditor Horowitz to debtor Garcia, Garcia

16

evaded and neglected good faith correspondence.

56. While researching the Defendants online in preparation for filing this lawsuit, the Plaintiff discovered that Garcia's financier and partner in Emerald, Mr. Zupnick, was among several officials indicted and prosecuted by New York State attorney general, Letitia James, "for years of financial fraud and self-dealing that led to severe understaffing and . . . neglect and harm" to elderly citizens.

57. To wit, the Plaintiff also discovered that Garcia's named partnership with Zupnick in "7 Digital" had no 'footprint' online or in the business community, giving good cause to presume Garcia and Zupnick were complicit in self-dealing, even laundering Horowitz's payment of $21,000.00 on October 29 through Garcia's personal bank account rather than to or thru Emerald (for product manufacturing fraudulently promised and never provided).

58. Plaintiff's research into Garcia's business interest with Zupnick also revealed manufacturing and distribution to nursing homes of products directly competing against Horowitz's products, raising concerns that the elderly Plaintiff was willfully, knowingly, and maliciously defrauded by Garcia and Zupnick to damage the Plaintiff's business interests, and convert the doctor's "528 intellectual property" and "water structuring" knowhow, to illegally enrich the Defendants' enterprise.

59. This Complaint alleges civil and possibly criminal violations akin to *People of the State of New York v. Cold Spring Acquisition, LLC et. al.* that included prosecuting "JOEL ZUPNICK." Attorney General Letitia James summarized this cause of action for similarly inflicted "rampant fraud, avarice, financial loss . . . ,

and repeated and persistent violation of laws designed to protect vulnerable people . . . [T]he harrowing breadth and depth of the findings of . . . neglect, harm and suffering, and the persistent fraud and illegality in Respondents' operation . . . is appalling and warrants due exposure and redress."

## VI. CLAIMS

### <u>CLAIM I</u>

**VIOLATION OF**
**Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)**
**Stat. § 501.202 (based on the FTC ACT 15 USC §45)**

**Making False Representations of Manufacturing Service**

Plaintiff realleges and incorporates Paragraphs 1 through 59 above as though fully set forth herein, and sues all Defendants for violations of FDUTPA and the FTC Act.

60. Stat. § 501.202 (and FTC Act, 15 U.S.C. § 52) prohibits "unfair or deceptive acts or practices in or affecting commerce."

61. In order for a consumer to claim damages under FDUTPA, they must prove three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

62. A plaintiff must not only prove that the conduct complained of was unfair, unconscionable, or deceptive, but also that it suffered actual damages, proximately caused by the unlawful conduct. *In re Florida Cement and Concrete Antitrust Litigation*, 746 F. Supp. 2d 1291, 1321 (S.D. Fla. 2010).

63. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by the FDUTPA, that along with the FTC Act prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.

64. Defendant Garcia falsely advertised the services of Emerald Nutraceuticals, LLC misrepresenting verbally, in writing, and through online advertisements, the reliability of the Defendants' manufacturing service.

65.  Specifically, Defendants falsely and misleadingly advertised, "installation of multiple fully automated production lines for liquid products as well as packaging equipment" that caused the Plaintiff to trust Garcia and contract with Emerald.

66. Later it was revealed that Emerald repeatedly lacked the pumps required to bottle the Plaintiff's liquid products, causing damaging delays and business losses.

67. Garcia misrepresented Emerald's capacity to timely produce the Plaintiff's products citing "10-14 days" for "gearing up" after payment was received. Months after payment, purchased products had still not been produced.

68. Further evidencing deceptive trade concealing incompetence, Garcia's subordinate "manager" Pfenning wrongly administered the safety-sealing of approximate 1500 defectively-sealed bottles resulting in many consumer complaints, returns, and damage to the Plaintiff's reputation and business.

69. More deception included Pfenning erroneously administering inventory control resulting in falsely alleged depleted inventory, and false claims that the Plaintiff was in urgent need to pay Emerald more money to manufacture more products when that was not true.

70. Omissions of material facts regarding Emerald's manufacturing service, including inoperable pumping equipment, lacking staff, and incompetent, even reckless, management, caused Plaintiff to: (a) lose approximately $60,000.00 in cash; (b) lose dozens of loyal customers; (c) lose many wholesale accounts; (d) damage Dr. Horowitz's professional reputability; and (e) lose millions of dollars in prospective business advantage since the Plaintiff initially contracted with the Defendants to advance a collaboration with the TruLife distribution and marketing company selling through Walmart and other large volume retailers.

71. Garcia tortiously interfered with the Plaintiff's prospective business advantage with TruLife by disparaging TruLife in order to persuade Horowitz to entrust his entire business--manufacturing, distributing, and marketing operations—to Garcia and Emerald.

72. As a result of Defendants' deceptive trade practices, the Plaintiff was damaged financially more than $70,000.00, and prospectively many millions of dollars.

73. Absent equitable relief by this Court, Defendants remain swindled and deprived of their 'out-of-pocket' investment, prospectively millions of

dollars; and the Defendants are likely to continue to defraud and injure consumers, reap unjust enrichment, and harm the public interest.

## CLAIM II

### VIOLATION OF
### Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)
### Stat. § 501.202 (based on the FTC ACT 15 USC §45)

### Making False Representations of Distribution Service

Plaintiff realleges and incorporates Paragraphs 1 through 67 above as though fully set forth herein, and sues all Defendants for violations of FDUTPA and the FTC Act, pursuant to their false distribution service representations and enterprise.

74. Stat. § 501.202 (and FTC Act, 15 U.S.C. § 52) prohibits "unfair or deceptive acts or practices in or affecting commerce."

75. According to Florida law, misrepresentations or deceptive omissions of material facts constitute deceptive acts or practices prohibited by the FDUTPA.

76. Defendant Garcia falsely advertised the distribution services of Emerald Nutraceuticals, LLC misrepresenting verbally, in writing, and through online advertisements, the reliability of the Defendants' distribution services.

77. Specifically, Defendants falsely and misleadingly advertised, "The Emerald Corp. is a full-service manufacturer and distributor of alternative health products based in Long Island."

78. On November 25, 2022, Garcia replied to the Plaintiff's pleading for more timely and competent administration of the Defendants' falsely promised distribution services by admitting, for the first time, Emerald was not set up to administer Horowitz many orders timely and according to professional standards for order fulfillment. Garcia excused himself and Emerald by writing, "I don't have the staff back there to ship out."

79. Garcia followed this admission with a false and misleading representation that Emerald was capable of shipping "40-60 orders per day." Subsequently, after this falsehood was noticed, Garcia admitted his short staffing and mismanagement was awaiting a "move across the street" to a new facility with additional staff.

80. Omissions of material facts regarding Emerald's distributing service, including lacking staff, untimely delayed shipping practices, and incompetent, even reckless, management, caused Plaintiff to: (a) lose approximately $60,000.00 in payments; (b) lose dozens of loyal customers; (c) lose many wholesale accounts; (d) damage Dr. Horowitz's professional reputability; and (e) lose millions of dollars in prospective business advantage since the Plaintiff initially contracted with the Defendants to advance a collaboration with the TruLife distribution and marketing company serving Walmart and other large volume accounts.

81. As a result of Defendants' deceptive trade practices cited above, the Plaintiff was damaged financially, presumably many millions of dollars.

82. Absent equitable relief by this Court, Plaintiff will not be 'made whole,' and Defendants are likely to continue to defraud and injure consumers, reap unjust enrichment, and harm the public interest.

83. Accordingly, the Plaintiff prays for restitution by Court award of his initial $60,000.00 investment, plus millions more for lost prospective business advantage.

## CLAIM III

### Tortious Interference with Prospective Economic Advantage

84. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 83, particularly Paragraphs 10 and 11 identifying Defendants' interferences with the Plaintiff's business relationship with TruLife, as though fully set forth herein; and sues Defendants for tortuously interfering with Plaintiffs' prospective economic advantage.

85. The Plaintiff derives his income from sales of consumer products and royalties paid to him.

86. Over the years, Plaintiff developed an actual prospective economic relationship with Internet users that search for Plaintiff and his products on search engines, prompting TruLife officials to solicit "Dr. Horowitz" to secure and expand his nutraceutical business using TruLife's marketing and distribution services.

87. Defendant Garcia was aware of the Plaintiff's prospective economic relationship with TruLife when he acted to disparage TruLife to persuade

Horowitz to rely on Emerald exclusively to distribute and market his new brand of "528 Electroceuticals."

88. As a direct and proximate cause of the Defendants' intentional, false, and wrongful persuasion tactic, and tortious interference, the Plaintiff suffered non-monetary and monetary damages exceeding Horowitz's initial down-payment of $35,000.00 paid to Emerald, and $21,000.00 wired to Garcia; with several million dollars more anticipated to be lost annually as a result of lost expected sales through TruLife.

89. WHEREFORE, Plaintiff respectfully requests that this Honorable Court declare Defendants Garcia and Emerald liable for intentionally disrupting and interfering with Plaintiff's prospective economic relationships and business advantage with TruLife.

90. Plaintiff further prays for the Court to award an amount to compensate the Plaintiff for his monetary damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this Court deems just and proper.

## CLAIM IV

### Breach of  Manufacturing Contract[1]

91. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 90 above, particularly Paragraphs 12 through 15, 33 through 34, and 43, and further alleges:

---

[1] An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages. *J.J. Gumberg Co. v. Janis Servs., Inc.,* 847 So.2d 1048, 1049 (Fla. 4th DCA 2003); *Indus. Med. Pub. Co. v. Colonial Press of Miami, Inc.,* 181 So.2d 19, 20 (Fla. 3d DCA 1966)* ("In contract actions, the complaint must allege the execution of the contract, the obligation thereby assumed, and the breach."). *Cited in: Friedman v. New York Life Ins. Co.,* 985 So. 2d 56 - Fla: Dist. Court of Appeals, 4th Dist. 2008.

92. Defendants established a valid contract with the Plaintiff to manufacture four of his best-selling products, namely: (a) OxySilver™; (b) Liquid Dentist™; "ZeoLOVE"; and "PureGo".

93. Defendants' Manufacturing Contract is well evidenced by the aforementioned facts, payments made by the Plaintiff by wire transfer(s) from the Plaintiff's bank to the Defendants' bank accounts, e-mails, and verbal correspondence between the parties.

94. Defendants materially breached their Manufacturing Contract by failing to timely manufacture the products "within 10-14 days" as Garcia misrepresented; and as was understood and accepted by the Plaintiff.

95. Defendants Garcia and Emerald staff justified and excused their repeated delays and breaches of the Manufacturing Contract, by reason of:

  (a) repeated pump failures;

  (b) understaffing;

  (c) manufacturing staff absences due to vacations, and

  (d) car accidents, wherefore Emerald officials repeatedly apologized.

96. Defendants additionally materially breached their Manufacturing Contract by neglecting to:

  (a) use reasonable and customary care in sealing manufactured products;

  (b) comply with Plaintiff's requested high gloss label requirement;

  (c) send the Plaintiff test samples of the products manufactured, to obtain the Plaintiff's approval of the manufactured products prior to shipping them; and

  (d) secure the Plaintiff's approval on the quality of the manufactured products, including taste and fitness for human consumption, and safety sealing.

97. Damages to the Plaintiff caused by the Defendants' breach of Manufacturing Contract include:

(a) lost  financial investment of approximately $60,000.00;

(b) lost prospective economic advantage of several million dollars caused by subverting TruLife's contract with the Plaintiff precluding large volume sales to national chain stores including Walmart.

(c) lost wholesale and retail accounts due to the Defendants' disruptive delays;

(d) thousands of dollars in losses from poorly manufactured product returns, refunds to customers, and subsequent remedial shipping and manufacturing costs to replace complainants' unacceptable products; and

(e) damaged reputability of the Plaintiff.

98. Furthermore, the Defendants breached their Manufacturing Contract to produce 500 bottles of "PureGo - 528 Electroceutical" (multi-vitamin formula), for which the Plaintiff paid $6,975.00, but that was never produced.

99. The PureGo Manufacturing Contract was undermined by Garcia, who misrepresented that product and brand would be timely manufactured, marketed, and distributed in a special new bottle and label for the pledged new partnership with Horowitz, Zupnick and "7 Digital". This turned out to be false.

100. The Court, in the exercise of its equitable jurisdiction, may award restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

101. WHEREFORE, Plaintiff requests entry of a judgment against Defendants Garcia, Zupnick, Adonis, and Emerald, for breach of Manufacturing Contract; granting the Plaintiff also compensation for his damages in an amount within the jurisdictional limits of this honorable Court, including an award of interest,

attorneys' fees, and costs exceeding the Plaintiff's out of pocket payments of $35,000.00,  $21,000.00, and $6,975.00.00, totaling more than $60,000.00.

## CLAIM V

### Breach of Distribution Contract

102. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 101 above, particularly Paragraphs 11 and 16; and Paragraphs 36 through 41; and 48-49, and further alleges:

103. Defendants established a valid Distribution Contract with the Plaintiff to ship and fulfill orders for the Plaintiff's four best-selling products.

104. Defendants Distribution Contract is well evidenced by the aforementioned facts, e-mails, and verbal correspondence between the parties, as well as the payments made by the Plaintiff by wire transfer(s) from the Plaintiff's bank to the Defendants' bank. On December 9, 2022, Plaintiff paid $1,191.50 for the Defendants' delayed, haphazard, and incomplete distribution services.

105. Defendants materially breached their Distribution Contract by failing to timely distribute the products within a reasonable period of time.

106. Defendants, for example, printed shipping labels for the bulk of the Plaintiff's backorders on November 18, but neglected to ship those products for two to three weeks.

107. Defendant Garcia initially falsely excused this damaging negligent administration and breach of Distribution Contract by blaming his lacking awareness of the amount of orders the Plaintiff received, even though the Plaintiff repeatedly and urgently made this high volume known.

108. Subsequently, Garcia wrongly excused his staff's manufacturing delays, and then falsely excused his limited capacity to ship only "40-to-60 orders per day" to the Plaintiff's customers. But had that number of orders been shipped, there would not have been any objectionable delays or backorders.

109. Finally, Garcia admitted in writing that mismanagement and short staffing caused the damaging delays in shipping orders.

110. Damages to the Plaintiff caused by the Defendants' breach of Distribution Contract include:

(a) lost prospective economic advantage of several million dollars caused by Garcia subverting TruLife's pending distribution contract with the Plaintiff, precluding large volume sales to national chain stores (including Walmart) as planned.

(b) lost wholesale and retail accounts due to the Defendants' disruptive delays, inconveniencing and angering customers;

(c) thousands of dollars in losses from subsequent remedial shipping (and manufacturing) costs to replace complainants' unacceptable products; and

(d) damaged reputability of the Plaintiff.

111. This Court, in the exercise of its equitable jurisdiction, may award restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

112. WHEREFORE, Plaintiff requests entry of a judgment against Defendants Emerald, Garcia, Zupnick, and Adonis, for Breach of Distribution Contract; granting the Plaintiff compensation for his damages in an amount within the jurisdictional limits of this honorable Court, including an award of interest,

attorneys' fees, and costs exceeding the Plaintiff's investments of more than $60,000.00.

## CLAIM VI

### Breach of "528 Electroceuticals" Contract

113. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 112 above, particularly Paragraphs 25 through 27, and Paragraph 42, and further alleges:

114. Defendants Garcia, Zupnick, and/or Adonis, falsely contracted to have the Plaintiff join their "partnership" in the unregistered entity Garcia identified as "7 Digital" that purportedly would advance the partners new enterprise in "528 Electroceuticals" based largely on Horowitz's pioneering water science and "528 frequency" intellectual property.

115. Defendants' 528 Electroceuticals Contract is well evidenced by the aforementioned facts, e-mails, and verbal correspondence between the parties, as well as the payment of $21,000.00 made by the Plaintiff by wire transfer(s) from the Plaintiff's bank to Garcia's personal bank account to secure this Contract.

116. The Defendants leveraged Garcia's false promise to establish this new "partnership" with the Plaintiff, that would manufacture, market, and distribute the Plaintiff's new brand, featuring several "528 Electroceuticals."

117. Garcia induced the Plaintiff to unjustly enrich Garcia and his partners in 7 Digital $21,000.00, promising much success and sales, but never delivered anything beyond false promises on this Contract.

118. Nothing was ever gained from the Plaintiff's $21,000.00 investment. The Contract to produce "528 Electroceuticals" for this new partnership, and advertise

them on the Internet, was never kept.

119. Garcia also promised to e-mail the Plaintiff and his attorney this Contract in writing, detailing the terms of the promised partnership in which Horowitz invested his time and money, but Garcia never sent any such Contract.

120. As a direct and proximate result of Defendants' breach of their "528 Electroceuticals Contract," and in furtherance of Defendants' conspiracy to enrich themselves at Horowitz's expense, the Plaintiff suffered severe emotional distress and financial damage exceeding $21,000.00 because Garcia induced the Plaintiff to professionally prepare three scripts and audio-visual recordings to be used for marketing and sales promotions reasonably valued at $6,000.00 each, totaling $18,000.00.

121. To allegedly launch and market the "528 Electroceuticals" brand, Garcia misrepresented and falsely promised that the Plaintiff's audio-visual productions would be used to increase sales and enrich the "partners" in 7 Digital. These inducements and promises were all false.

122. The law empowers this Court to grant such relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.

123. This Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

124. WHEREFORE, Plaintiff requests entry of a judgment against Defendants Garcia, Zupnick, and Adonis, for Breach of 528 Electroceuticals Contract, defrauding the Plaintiff; granting the Plaintiff also compensation for his damages

in an amount within the jurisdictional limits of this honorable Court, including an award of interest, attorneys' fees, and costs exceeding the Plaintiff's investments of $21,000.00 and $18,000.00, totaling $39,000.00.

## CLAIM VII

### Fraud[2]

125. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 124 above, and further alleges:

126. Defendant Garcia, on behalf of his self-interest, and his partners in Emerald, falsely represented Emerald's capability to manufacture and distribute the Plaintiff's four nutraceuticals in late August, 2021.

127. Garcia's false statements of material facts included: (a) Emerald's capacity to begin manufacturing the Plaintiff's products in "10 to 14 days" from the time the Plaintiff paid his $35,000.00 down-payment by wire transfer on-or-about August 31, 2021; whereas, in fact, months of Emerald's delays proved Garcia's inducement to be false.

128. Moreover, Garcia falsely stated Emerald's administrative capacity to manufacture and distribute Plaintiff's products timely and competently; whereas,

---

[2] To state a legally viable claim for fraud, four elements must be sufficiently alleged:

> (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation. *Cohen v. Kravit Estate Buyers, Inc.,* 843 So.2d 989, 991 (Fla. 4th DCA 2003) (quoting *Lopez-Infante v. Union Cent. Life Ins. Co.,* 809 So.2d 13, 15 (Fla. 3d DCA 2002))

in fact, Garcia knew, or should have known, his deficient, unreliable, and even negligent staffing, would repeatedly cause delays, defective manufacturing, delayed shipping, damage to the Plaintiff, distress to the Plaintiff and his customers, and lost customers.

129.  Additionally, on November 25, 2022 by e-mail, Garcia falsely stated that Emerald could and would ship "40 to 60" orders for the Plaintiff daily. Had this been true, all of the Plaintiff's backorders would have been, and should have been, fulfilled timely, but they were not.

130. Garcia knew, or should have known, that it would take months, not "10 to 14 days," to manufacture and fulfill the Plaintiff's orders, given Emerald's deficient and defective manufacturing equipment, under-staffing, and fulfillment preclusions.

131. Garcia intended, by his misrepresentations and omissions, to induce Dr. Horowitz's reliance on Emerald's manufacturing and distribution services and contracts, including the Plaintiff's contractual interests in "7 Digital" that Garcia falsely represented would be set in stone with his "proposal" per his October 23rd e-mail correspondence.

132. Relying on Garcia's false statements, the Plaintiff prepaid Emerald, and also Garcia personally, $35,000.00 and $21,000.00 respectively, and lost more than $60,000.00 wire transferred to the Defendants.

133. In addition, by relying on Garcia's false statements, the Plaintiff withdrew his interest in TruLife's contract to sell the Plaintiff's products to large national chain stores, including Walmart, depriving the Plaintiff of millions of dollars in sales and prospective business advantage.

134. In addition, by relying on Garcia's false statements, the Plaintiff withdrew his

interest in TruLife's contract to sell the Plaintiff's products to large national chain stores, including Walmart, depriving the Plaintiff of millions of dollars in prospective sales and business advantage.

135. WHEREFORE, Plaintiff requests entry of a judgment against Defendants Emerald, Garcia, Zupnick, and Adonis, for fraud, pled with particularity; granting the Plaintiff compensation for his damages in an amount within the jurisdictional limits of this honorable Court, including an award of interest, attorneys' fees, and costs exceeding the Plaintiff's investments of more than $75,000.00.

## CLAIM V
### Civil Conspiracy[3] to Gain Unjust Enrichment

136. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 135 above, particularly Paragraphs 25 through 27, and Paragraph 42, and further alleges:

137. Defendants Garcia, Zupnick, and/or Adonis, conspired with one another, as well as with other individuals and entities known and unknown, to perpetrate unfair and deceptive trade by issuing deceptive advertisements and false inducements pursuant to advancing a "partnership" with the Plaintiff through an

---

[3] Under Florida law, "[t]he elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA2006). Generally, an actionable tort or wrong is required. Alternatively, a claim of civil conspiracy may be established if plaintiff "can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." Walters, 931 So. 2d at 140

unregistered entity Garcia superficially identified as "7 Digital".

138. These Defendants hoodwinked the Plaintiff to get Horowitz to wire Garcia personally $21,000.00 to fuel 7 Digital, falsely represented by Garcia as a new "partnership" with the Plaintiff that would manufacture, market, and distribute the Plaintiff's line of "528 Electroceuticals" earning the partners millions of dollars.

139. In other words, the co-conspirators and scammers induced Plaintiff to enrich Garcia personally, as well as the 7Digital shady entity owned or operated by the co-Defendants, to the Plaintiff's detriment and damage, unjustly enriching the Defendants at least $21,000.00.

140. Nothing more than wasted time and money causing distress was ever gained by the Plaintiff for the contractual investments in the Defendants and 7Digital. No products or advertising was ever produced by the Defendants or 7 Digital. Garcia neglected his duty and commitment to e-mail Horowitz and his attorney the 7Digital contract.

141. The Defendants, as complicit scammers, increased the 'peculiar power of coercion' by virtue of their combination, which each individual Defendant acting alone did not possess.

142. As a direct and proximate result of Defendants' participation in, and furtherance of, the conspiracy, the Plaintiff suffered severe emotional distress and financial damage exceeding $21,000.00.

143. The scammers caused the Plaintiff to professionally prepare three scripts and audio-visual recordings to be used for marketing and sales promotions reasonably valued at $6,000.00 each, totaling $18,000.00. Garcia misrepresented and falsely promised that the Plaintiff's audio-visual productions would be used to increase sales and enrich the "partners" in 7 Digital. Adding $21,000.00 to $18,000.00

establishes losses under this claim (i.e, actual damages) at $39,000.00.

144. The FDUTPA and FTC Act (Stat. § 501.202 and 15 U.S.C. § 52, respectively) empowers this Court to grant such relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.

146. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

147. WHEREFORE, Plaintiff requests entry of a judgment against Defendants Garcia, Zupnick, and Adonis in the amount of actual damages of $39,000.00, enjoining them from continuing their conspiracy gaining them unjust enrichment by defrauding the Plaintiff; granting the Plaintiff also compensation for his damages in an amount within the jurisdictional limits of this honorable Court, including an award of interest, attorneys' fees, and costs as authorized by law.

## VII. PRAYER FOR RELIEF

148. WHEREFORE, Plaintiff, acting as a private citizen as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and the Court's own equitable powers, requests that the Court:

 A. Award the Plaintiff the aforementioned damages, or such relief, damages or compensation for losses as the Court finds necessary to redress the Plaintiff's injuries resulting from Defendants' violations of the FTC Act; tortious interference; breaches of three contracts; fraud in the factum and fraud in the inducement; and civil conspiracy to hoodwink the Plaintiff for unjust enrichment;

including, but not limited to, restitution, rescission or reformation of contracts as the Court deems justified, refunding monies paid by the Plaintiff to the Defendants without gain; and compensation for damages sustained by the Plaintiff due to Defendants' alleged torts; and

B. Award Plaintiff the fees and costs of bringing this action; as well as such other and additional relief as the Court may determine to be just and proper.


Respectfully submitted,


DATED: August 30, 2023

LEONARD G. HOROWITZ, pro se

SUMMONS TO:

EMERALD NUTRICEUTICALS, LLC
48 Mall Dr, Commack, NY 11725

MICHAEL GARCIA, Co-Founder and CEO
EMERALD NUTRICEUTICALS, LLC
48 Mall Dr, Commack, NY 11725

CHESKAL ZUPNICK, Co-Founder and CFO
EMERALD NUTRICEUTICALS,  LLC
90 Ross Street, Brooklyn NY 11249

JOEL "JOSEPH" ZUPNICK, CEO
SPECIALTY RX, INC.
2 Bergen Turnpike, Ridgefield, NJ 07660-2340

SPECIALTY RX, INC.
2 Bergen Turnpike, Ridgefield, NJ 07660-2340

STEVENS ADONIS, COO
EMERALD NUTRICEUTICALS, LLC
48 Mall Dr, Commack, NY 11725